May it please the Court. My name is Robert Oakley. I'm here on behalf of the Federal Defendants. In terms of the time date, Your Honors, I'm splitting the 20 minutes with Ms. Kate Poole, who represents the Environmental Intervenors, NRDC, and Earth Justice. Ten minutes each, although I would like to up my ten minutes, if possible, save a minute for rebuttal, if that is going to work. I know it's my responsibility to watch the clock. All right. Thank you, Counsel. Please proceed. May it please the Court. This case concerns the government and NRDC's appeal of the District Court decision overturning a biological opinion by the Fish and Wildlife Service that related to the operation of Reclamation's Central Valley Project and California's State Water Project. That biological opinion found that the operation of the two irrigation projects were putting the Delta Smelta threatened species under the Endangered Species Act at jeopardy. And that jeopardy determination has not been disturbed by the District Court, nor has it been argued or disputed in this Court. So this case does have a long and tortured history. It does. But we're here to determine whether or not the reasonable and practical alternative determination that was made by the government agency was supported by science. Is that correct? I think that's correct, although there are certainly arguments in the briefs, and I'm not really even having briefed it myself now, clear on this, that really don't go to elements of the RPA. There are questions relating to other stressors or predation or things like that, which the RPA does not ask either Reclamation or the State Water Project to address. But I think the focus, the interest in the briefs and what's driving this case is the science backing up the RPA here that Fish and Wildlife proposed, and it had to propose an RPA, to bring, to protect the smelt from being at jeopardy and protect against adverse modification. I should have said reasonable and prudent alternatives, right? That is correct. Reasonable and prudent alternative. It's defined in, I think, 50 CFR 402.02. Now, we think the District Court went wrong in a broad way. There are many, many issues in these briefs. But generally speaking, we think this District Court did not review this case as it should have under the APA, giving sufficient deference to the agency, making very technical decisions in a, against a backdrop where there's a great deal of uncertainty, and that the District Court instead relied too much on expert declarations submitted by the plaintiffs and conducted in times of battle of the experts, which this Court has rejected time and time again, and particularly in the en banc lens counsel case. Now, let me go to one part of the RPA to talk about some of these errors. Counsel, before you get to that, if I may, let me ask you something that the first statement suggests. In determining whether the best available science was used, this Court, it seems to me, was certainly within its prerogatives to seek out experts who explained to it exactly what was at stake here in terms of the technical difficulties and the, you know, the science generally and to help the Court understand what the issues were and to sort of navigate that thicket. I mean, would you concede that? I would concede that some use of additional testimony to explain this is a highly technical case, as the Court is undoubtedly aware now from many of the briefs, would have been appropriate. But if you move to is Dr. X expert for the plaintiffs more correct than Dr. Y expert for the fish and wildlife, I think you've gone too far. So, counsel, in this case, the Court appointed experts to assist the Court in reviewing the science. But there are also supplemental affidavits and opinions that were given of experts who were not appointed by the Court. Is that correct? That is correct, Your Honor. And in fairness, I should note that the government and NRDC, after our opposition to appointment of either experts or admission of these experts retained by plaintiffs, after our oppositions were denied, we also, Fish and Wildlife, submitted extra record declarations to respond to the declarations that the plaintiffs had submitted. So it's a big record. And when I say it's a big record, it's a big administrative record, but it has been now supplemented substantially by the District Court. And we think it went beyond what the Court should have done. I think what the Court was looking for, and I just want to, this falls in the general catalog of errors, is on the best available science, that means the best science available now. And in some cases, in many cases actually, with reference to the smell, there's a great deal that's simply not known about that. That would require further development. But it still has to be science. I mean, it can't be. That's correct. I think it seems to me that in the phrase best available science, what you want us to focus on is the word available, but there's another word in there. What? And that is science. Yes, it still has to be science. And I think what the District Court said was it wasn't science in a sense, that they just simply didn't do a proper scientific job. That's right. But in doing so, and I'll move to the Fall X-2 issue, which I think illustrates this, I think the District Court, by not giving deference to the agency, I have to say, frankly, got confused about some of the either reliance that Fish and Wildlife was making on the science, or what exactly the science meant and why it was relevant. But let me go to the Fall X-2 remedy, if I could, part of the RPA. As the Court will recall, this applies only in years which classified as either wet or above normal by California's Department of Water Resources. So, for example, it did not apply in this fall. It would have, well, in some ways it would have applied last year and, in fact, did apply even though the District Court enjoined it because there was so much water in the system. But I'll get to that in a second. X-2 refers to a salinity measurement, and that salinity measurement is found to be where the smelt like to be. So as it moves, the smelt moves. So it's used... Not much is conceded. It's a kind of a rough proxy for where the smelt will be. That is correct, Your Honor. And the point of the Fall X-2 remedy was this. As the system was operating now, and I emphasize now, not in the future, as the system was operating now and had been operating for many years, regardless of how much rain fell or precipitation fell, that there was chronic drought conditions. That is the location of X-2 looked at on a historical basis was mimicking as though every year was a drought year, even if it wasn't. So X-2 provided that when those special years come along, for example, let's take the best year, wet year, which was, if I'm correct, 2011. A wet year required X-2 to be on a monthly average for September and October at 74 kilometers from Golden Gate Bridge because this would give the smelt access to greater amounts of habitat and higher quality habitat. Now, the judge said this was an arbitrary and capricious RPA for two reasons, and he was wrong on both. Reason number one, he got tangled up in the calibration issue between two programs. One of them is called Dayflow. The other called CalSIM. Dayflow uses historical inputs and to make determinations about the location of X-2, among other things. CalSIM is used for projections in the future. The judge said you can't compare Dayflow results to CalSIM results. And what did he base that determination on? That there are differences in the inputs to the models, and I believe in the actual calculation of the location of X-2. But was that something that he learned from one of the experts or from all of the experts? How did he come to the conclusion? I know that that information was argued in or provided in an expert declaration by, I believe, a Mr. Miller, who is an employee of DWR and thus on the other side of this case. But my point is that that was irrelevant, and this is how he got tangled up in irrelevancies. CalSIM is used for future projections. You can't use Dayflow for future projections. The biop, and we try to make this very clear, especially in our response brief, the final brief we filed, the biological opinion is filled with statements that says that right now, X-2 is not where it should be in these wet and above normal years. So was your point that you were measuring the ideal location from a snapshot point of view, and the court was trying to have you merge that with future projections? Is that your point? Well, that's somewhat our point, but our point is that throw out the future projections. Let me put it that way. Just say, ignore anything about what the biological opinion says about where X-2 would be in future operations. There would still be the need of the fall X-2 RPA based on the last 10 years of historical evidence, so that the projections unfortunately became something of a red herring. This is not like an action where, say, Reclamation is going to dramatically alter its way in which it's operating the system. It is, and thus there's a future action and it's going to be a big change. The action is defined as a continued long-term operation. And so there's no big change provided for in the future. As a practical matter, is the agency in the process of doing another biological opinion at this point? Yes, Your Honor, it is, because the district court judge order which we are complying with requires that and requires a NEPA process. So I think on the fall X-2 thing, the point I really need to make is, this is an example of the judge getting tied up on irrelevant matters because of the projection issue. You don't need the projections. Let me ask you this. If we were to disagree with the district court decision, would that biological opinion still go forward, the one that's in process now? Well, the biological opinion, interestingly, has not been vacated in the sense that if you're speaking in terms of the RPA now, the fall X-2 RPA was enjoined last fall. This Court has held that that's moot. So if fall X-2 were to come up again in the future, they'd have to go in. Again, there'd have to be another preliminary process. That wasn't precisely my question. My question was, will the biological opinion that's in process now proceed regardless of the ruling in this case? Yes, insofar as, perhaps not to the extent of issuing a new biological opinion, but a great deal of information, which is not a part of the record of this case, was gathered, for example, by last fall because X-2, in fact, was hit. That goal was met even though the judge enjoined it because there was so much water in the system. There's data. And if you look at the justifications for the RPA, you'll see there's all this effort by Fish and Wildlife to fine-tune this on an adaptive management basis. There's just a lot that's not known about this. So would operations or would directions from Fish and Wildlife be different in 2013, regardless of whether it issues another formal biological opinion? I think, yes, they probably would, although I'm not qualified to say how. You mentioned the NEPA process. I'm a little uncertain about how the NEPA process is working because, as I understood it, NEPA requires before any major federal action goes forward that its provisions be followed, including, importantly, the production of an EIS. Isn't that right? That is correct, Your Honor. But the project is not a project operation. The action, actually, has not been suspended, right? So how is NEPA being honored in this context? Well, the judge set up a back-and-forth where it assumed that a new biological opinion would be done. It's due in December of 2015. Yeah, I know. And then there's a 25-month time frame or something like that. Yes, Your Honor. How does that comply with NEPA? There is supposed to be. I know that's not really an issue here exactly, but I just don't understand the present posture of the facts. It's a difficult question, Your Honor, or it's a difficult process for the agencies, because rather than one following the other, there's sort of back-and-forth exchanges of information.  Simultaneously. Doesn't NEPA say you have to do all this before you can actually put the action into effect? Yes, Your Honor, although the court did just impose the NEPA obligation on fish and wildlife, and I'm sorry, I'm dead wrong, dead wrong. Let me start again. The court imposed the NEPA obligation on reclamation and not on fish and wildlife. But on implementation, is that right? On implementation, fish and wildlife, while it does have the obligation, it has to work to help or give what assistance. But that implementation, because part of it has been implemented and continues to be implemented. Isn't that right, or the buy-off? That is, to the extent that it is. So it's not vacated. That is correct, Your Honor. It has not been vacated. You're down to five minutes. Yes, I'm eating way into my co-appellate's time, so perhaps I should turn it over to her. All right, thank you. Thank you. May it please the Court, good morning. My name is Kate Poole. I'm here today on behalf of the Environmental Interest Appellants, the Natural Resources Defense Council, and the Bay Institute. I'd like to start out, Judge Rawlinson, by addressing your question, because I don't, I think the question before you is much narrower than whether the RPA was supported by science. The question in this case is really whether the administrative record, before the Fish and Wildlife Service at the time it issued its biological opinion in the attendant RPA in 2008, provided a rational basis for the service to make the decision that it did. Based on the best available science, right? Based on the best available science. But this Court has lengthy precedents going back many, many years, making it clear that courts are not supposed to be the arbiter of scientific disputes. The agency, the expert agency here, the Fish and Wildlife Service, is the agency that Congress gave that responsibility to. Unfortunately, we have the task of trying to look at all of this scientific evidence and make a determination as to whether or not the agency has fulfilled its obligation under NEPA to take a hard look at all the science and whether or not the results of the scientific process should be approved. And so in doing that, the district court in this case thought it appropriate to consult with other experts to determine whether or not the efforts of the agency had been complied with the requirements imposed upon them. What's your response to that? That's correct, and that's where we think the district court went very wrong, in admitting extensive extra record evidence and not limiting its review to the record before the agency. The Ninth Circuit allows, well, both the Supreme Court and the Ninth Circuit have very clearly said that in this type of case, the first look should be to the record that's compiled before the agency, and a court should only go beyond that in very limited circumstances. There are four narrow exceptions to that record review rule in this case, and the district court judge only cited one of those exceptions. He said that he was admitting the extra record evidence, quote, let me see if I can find it here, only for the purpose of explaining complex scientific issues and technical matters. Now, the court, and the court allowed the plaintiffs to submit 61 declarations before summary judgment issued on those grounds. Twenty of those were submitted on summary judgment alone, but they were, you know, often referred back to previous declarations. That goes far beyond what this court has allowed in the past. In the Asarco case, for example, the Ninth Circuit said the district court went too far when it allowed 10 declarations to come in and held a four-day hearing. Here the court went far beyond that, held lengthy multi-day evidentiary hearings, and submitted extensive extra record evidence. If that's what the district court viewed as necessary to understand the science underlying the biological opinion, why is that wrong? Well, it's wrong, Your Honor, because it was not the district court's job to figure out whether the science was right or wrong. The scientific experts in the agencies are given that job. Now, the exceptions. Does that mean we always defer to W.S.? No. The court has to decide whether it's science or whether there's simply no connection between the facts and the result. Isn't that right? Well, the court's job is to figure out whether the service ignored significant scientific information that it shouldn't have or whether the court needs to calibrate the models, for instance. Why wouldn't that fit in your category? The district court said that the models were not comparable, essentially apples and oranges, and that was, in fact, what most of the experts said. Well, in that case, Your Honor, that's an interesting example, because the court just misunderstood what the agency did in that example. Well, that might be, but that is an example. But it is true that a court has the authority, the power, and the duty, in fact, to say in an appropriate circumstance the science here was simply not correct. In order to do that, it has to make some sort of scientific judgment, does it not? Well, I think the court can obtain outside information for one of the four narrow exceptions to the record review rule. Here it said it needed that outside help for explanation of these complex issues. But in this case, the court already had before it four impartial experts that it appointed under Federal Rule of Evidence 706. Now, those experts had nearly identical resumes and expertise to many of plaintiff's experts. And the court appointed those 706 experts for the very purpose of explaining complex issues and technical matters. So the court had available to it a resource to help it understand these issues and to help it make the proper determinations that it should have in interpreting the record before the agency and determining whether it ignored critical information. But the court didn't stop there, and it didn't explain why it didn't stop there. Instead, it allowed plaintiffs to submit far more extra record evidence and turn this case into a battle of the experts, which is not the appropriate role for the district court. Counsel, you've exceeded your time. We'll give you a minute or two for rebuttal. All right. Thank you very much. Thank you. Mr. Wilkinson. Good morning. May it please the Court, I'm Greg Wilkinson. I represent the State Water Contractors. The contractors are composed of 27 local public agencies that distribute water from the State Water Project throughout the State of California. They provide it to 23 million Californians, roughly 60% of the State's population. About three months before the biological opinion was actually filed and produced and filed with the court, an extension of time was sought by the Fish and Wildlife Service. And among the declarations that were provided to the court at that time was one by the project manager who indicated that this particular biological opinion was the most complex and lengthy biological opinion undertaken by the Fish and Wildlife Service ever. And the court granted the additional time that was sought. For the court to fully understand the technical terms and the complex subject matters that were being dealt with in this biological opinion, the court determined that it was essential for the court to have retained its own independent experts under Section 706. And by the way, 706E provides that nothing in the statute will preclude a party from calling its own experts. So the notion that they're mutually exclusive is just simply wrong as a matter of statute. Yes, counsel, that may be true. But generally, as a district court judge, when you call an expert to assist you in understanding complicated theories, it's to ask them to explain to you what does this term mean, what does that term mean, how these two interact as opposed to having competing affidavits as to which science is more persuasive and which theory should have been utilized to come to a conclusion. Would you please tell me what case is closest to the circumstances of this case where experts were allowed to engage in back and forth regarding the best science? What's the closest case we have that would support the attack that the district court took in this case? I'm trying to recall a case. I'm a little bit at a loss in terms of prior authority. It's very unusual for it's almost like a mini trial. No, it wasn't that either. And I think it's important to correct statements, misstatements that were made by both counsel who appeared before me. This court did not convert these experts into a battle of experts. In a way, it did. I've read the record. And there was a lot of back and forth in terms of the expert and what was the best science and where the other scientists went wrong, which is kind of a classic battle. The court was attempting, I think, to understand material that was technically impenetrable. This was difficult stuff. When you get explanations about how, for example, a negative 5,000 CFS OMR limitation is put together, and you get into linear, linear terminology, it's simply not something that a lay person or a judge can understand. But our role is to determine whether or not the path that the agency took can be discerned. That's correct. From the explanations in the opinion. So we don't necessarily have to know whether or not the scientific theories were, you know, impeccably adhered to. What we need to know is whether or not the agency adequately explained the path from point A to point B. It's actually a bit more detailed than that. I think the case that comes closest in terms, and certainly one of the most recent cases, that deals with the whole issue of deference is the case of Lands Council v. McNair, which this court decided in 2010. That case talks about the fact that there should be deference to the scientific expertise of an agency. And it says, including the agency's choice of methodology. And that's what you hear from the appellants. There should be deference. We're close to this where you have all of the extraneous experts. Well, but then the Lands Council case goes on, and it says that the type of judicial review of an agency's methodological choices, which has been done in numerous cases, including Lands Council, involves first determining whether the agency has explained the methodology it used. Second, it involves checking modeling assumptions to ensure there is a reasonable scientific basis for them. Third, it involves checking to see if the data used were reliable. And fourth, it involves applying a clear error of judgment standard to ensure that the use of the modeling and the results were not arbitrary and capricious. It does not stand for the proposition that an agency's choice of methodologies and its application of those methodologies is unreviewable. Now, in this case, the cases before you, the judge, we believe, applied Lands Council appropriately and concluded that with regard to the ---- Did the judge defer at all to the scientific ---- Absolutely he did. Absolutely he did. He found that when there was science to support the agency position, he adopted it. There were a number of situations where the court deferred to the agency. It deferred to the Fish and Wildlife Service, for example, when it chose to use an old-fashioned stock recruit model for determining fishery abundance rather than a quantitative life cycle model. He deferred again when the service decided that X2 was a valid surrogate for delta smelt habitat. He deferred when the service relied on three different reports that the judge had questions about, FIRA 2007, FIRA 2008, and Bennett 2005. Okay, so where are the mistakes then? I'm sorry? So where are the mistakes? Where are the mistakes? The mistakes are, first, with regard to the negative 5,000 CFS. They rely on a comparison of flow to raw salvage. Raw salvage doesn't tell you anything unless it's been normalized to account for population abundance. So if you're diverting ten fish out of a population of a hundred fish, that's pretty important. If you divert a hundred fish out of a population of a million fish, it may not be so important. But the service didn't make that distinction. And what was their reasoning for not making that distinction? They didn't explain it. They never. They didn't explain it at all? No. And what confounds it even more, Judge Rawlinson. Correct, have we not? I'm sorry? They more or less conceded, at least by silence, that it wasn't correct. I think that's correct. In fact, they did average in another part of the biop. They did. They did in the incidental take statement. I think their present position is that even so, you can find why we did this in other parts of the biop, even though we didn't average, didn't normalize the way we should have. They say it with regard to the incidental take statement. They say, well, we did, in fact, use normalized salvage there. They don't explain why they did it there, but not over here. Instead, what they're trying to do is meld the two and somehow suggest that it's harmless error. It's not. You're stuck with a hard cap of negative 5,000 old and middle river flow that costs hundreds of thousands of acre feet of water per year. I'm sorry. No problem. Let's talk a moment, if we may, about the objection that the difficulty that the district court had with setting the X2 markers, the 74-kilometer and 81-kilometer markers. I mean, is it really possible to be entirely specific about where these things ought to be? I mean, if we recognize that X2 is important to the smelt population and its location needs to be somewhere within a defensible ballpark, why isn't that good enough? There is simply no explanation. But I mean, what kind of, what would a trigger look, what would an explanation of a trigger for the 71-kilometer marker look like? That there's a cliff there, that if you go one inch farther that the smelt's going to disappear? I mean, what kind of trigger? Actually, that argument was made, as you may be aware. I think the trigger, Your Honor, is that the measurement has to be linked. There has to be a connection between the facts found and the choices made in this sense that the mark needs to be set where it will avoid jeopardy to the species and avoid adverse modification of its critical habitat. But why wasn't the mark set by the district court as arbitrary as the one that was set by the Fish and Wildlife? Well, the district court had evidence that it took during the preliminary injunction proceeding that suggested that, in fact, the setting of the mark at kilometer 79, and the evidence, by the way, came from the government's witness, not from ours, that setting it at kilometer 79 ultimately would produce the same amount of habitat, suitable habitat, that the service had intended, in the biological opinion, to exist at kilometer 74. Was the function of the district court to set the marker? Well, on the preliminary injunction proceeding, yes, it was, because what was at stake was enough water for 7 to 10 million people per year. Well, the difficulty is the Fish and Wildlife Service has to balance. I mean, you're looking at it from the viewpoint of getting the most amount of water to the water users, but the Fish and Wildlife Service has to balance that against the continued endangerment of a species that everyone agrees is threatened. Throughout this proceeding, and I know my time is getting short, I've got to leave here, but throughout this proceeding, there was never any attempt to balance the needs of this fish against the needs of human beings. The court understood TVA versus Hill and applied it consistently throughout these proceedings. Well, I don't know about that. Well, doesn't the regulation, 40202, I think it is, or is it 20402? It's 40202. All those numbers are in there. We memorized those as part of our task here. 50 CFR. One of those so-called non-jeopardy factors requires taking into account the consistency of the proposed action with the project's purpose. Isn't that right? That is absolutely correct. Don't human beings come in at that point? They do. So why were they excluded? It is the definition of a valid RPA. The court didn't balance. The court said you've never explained how your RPA is consistent with the intended purpose of the project. You've never explained how your RPA is within the jurisdiction of the agencies to implement. And the agencies were concerned. I mean, throughout, the California Department of Water Resources was telling the service, this isn't consistent with the intended purpose of the state water project. It is not something that we can do. The service ignored it. Am I remembering correctly that when the wildlife service came out the other way, the district court reversed and said go back and try this again? So it's kind of schizophrenic in that sense that it seems as if the agency can't win for losing in this scenario. No. The agency, you're correct, the district court judge did remand an earlier biological opinion because he concluded it was insufficiently protective of the smell. He remanded this biological opinion because he concluded there was no evidence in the record to support a number of the factors that the agency had included within its RPA. I don't think there's an inconsistency at all. In each case, the judge has said we're going to do what's needed to protect the species, but I've got to have an explanation from the agency in order to accomplish what I'm supposed to be doing in terms of providing the judicial review that's required by law. And what he's found is that the agency, so far at least, is having trouble getting it right. With that, I'll stop and let my co-counsel. Thank you, counsel. May it please the Court. I am Daniel O'Hanlon. I represent the local public agencies that receive water supply from the Federal Central Valley Project. In my brief time this morning, I would like to address two issues that we raised by our cross-approval. First, that in its ESA effects analysis, the service failed to do the with and without action comparison required by its ESA regulations. Second, that the service failed to comply with NEPA, an obligation that's shared here with Reclamation under the unusual circumstances in this case. Beginning with the effects analysis issue, for the comparison required by the consultation regulations, the without action set of conditions is called the environmental baseline. The environmental baseline includes all past and present impacts of human activities and the impacts the species will experience in the future if the agency takes no discretionary action. For example, as this Court held in National Wildlife Federation v. NIMS, for consultation on a water project, the effects from the continued existence of the dam should be assigned to the environmental baseline. The continued existence of the dam and its impacts are a result of a past decision over which the agency has no discretion. By contrast, the effects of the action are what will be added to that baseline by the agency's action. So, counsel, if you just tie that into the record, what's the record in this case regarding whether or not the agency complied with those provisions? What the record shows here is that the service made no distinction going forward. From the date of the buyout going forward, it made no distinction with the impacts of the Center Valley Project from the existence of dams, from the existence of mandatory operations, or from the existence of discretionary operations. And so what evidence was there in the record that this constituted a violation of NEPA? Turning to the NEPA issue, as the quiz court held in Ramsey v. Cantor, a consulting agency, and the Fish and Wildlife Service here is the consulting agency, may have an obligation to comply with NEPA. Whether it does depends on the extent of its involvement in the action. Here, and that's a case-by-case determination, here the service was extensively involved in the action that produced the significant environmental impacts that are the subject of the NEPA requirement. That is, the change from status quo project operations to a new set of operations that significantly reduced water supply. First, those unusual circumstances include this involved an ongoing project where Reclamation was not proposing any changes to its operations. The Fish and Wildlife Service reached a jeopardy conclusion here. A jeopardy opinion is a rare event. By far the great majority are not jeopardy opinions. They do not include reasonable and prudent alternatives. Third, the reasonable and prudent alternative here resulted in significant losses of water supply with significant impacts on the human environment. And fourth, and perhaps most importantly, in the reasonable and prudent alternative, the service created a role for itself in operating these projects. It went from being an agency providing some consulting information to an agency that makes the decisions every spring about what the pumping rates will be. It does that because it sets the limits on the OMR flows, and the project operators then have to change pumping to meet those requirements. On these facts, in this case, the Fish and Wildlife Service as a consulting agency had an obligation underneath that. Briefly, back to the effects analysis issue. The service didn't do the comparison here required by its regulations, and that has very significant impacts because if the effects analysis is flawed, then so too are the conclusions on which it is based. Among those conclusions are the conclusion that project operations were jeopardized. Another consequence is that the reasonable and prudent alternatives, which are supposed to be directed at the effects of the action, are based on an invalid analysis. What is the error? Are you arguing that the district court erred? Yes. The district court found that, notwithstanding our argument that the service was required to distinguish between the baseline and the effects of the action, that it did not have an obligation to do so. Likewise, the district court ruled that the Fish and Wildlife Service did not have an OPA obligation, although Reclamation did. Right. And you think that's error? Yes, Your Honor. It's error because it's contrary to law. Well, isn't it the Bureau of Reclamation that has to decide whether or not to actually implement the RPA? Ultimately, the action agency is to make the determination of whether it's actually. . . And that would be the Bureau of Reclamation, right? Yes. Yes, that would be. However, there's a large catch here. The catch is the requirement that the Bureau of Reclamation have incidental take authority. Only the service can grant that incidental take authority. So it's a practical matter. If Reclamation says we disagree, we don't think that's really what's required. At the end of the day, the service has the trump card, which is it can withhold or grant that incidental take authority. And the Supreme Court in Bennett v. Speer said that authority is virtually determinative of what action the action agency will take. Unless the Court has further questions, I would like to leave time for Mr. Lee from the State of California. Thank you, Your Honor. Thank you. Your Honor, may it please the Court, my name is Clifford Lee. I'm the Deputy Attorney General with the California Department of Justice. And I'm here today on behalf of the California Department of Water Resources, an appellee in this case. The Department of Water Resources asks this Court to affirm the district court's decision in three important respects. One, that the faulty day flow and calcium comparison in the biological opinion invalidates the biopsy effects analysis. Two, that the 74-kilometer and 81-kilometer fall X2 reasonable and prudent alternative is not supported by any evidence in the record. And three, the failure to consider the non-jeopardy factors invalidates the biological opinions RPA under the service's own regulations. Now, with regard to the first issue, we would note that it is undisputed that it is the Department of Water Resources and not the U.S. Fish and Wildlife Service that is the party with the expertise as to the day flow and calcium models. In both situations, the Department of Water Resources, the State of California, developed those models. So we respectfully submit that no deference can be given to the United States. Two, it's also undisputed. Counsel, how can that be? I mean, you may have originated the models. The models may have originated at MIT. What difference does it make once the Fish and Wildlife Service adopts the models of its own and begins to use them? Well, it's because they used the output of the models that were provided by the Department of Water Resources in the original biological assessment. That's right. Then the Fish and Wildlife Service becomes responsible for adopting them and for the results. It adopts it as its own and becomes its own opinion. They certainly become responsible for the results, but that doesn't mean they use the results responsibly. And we argue in this case that the results were not used responsibly and that undisputed evidence establishes that it was. I understand that point, but that's very different from saying that the deference is owed to the California Department of Water Resources and no deference is owed to the Fish and Wildlife Service. Well, we do believe that there are cases that indicate that the deference is minimized when, in fact, and we recite them in our brief, where deference is minimized, where the expertise is held by other trained personnel. And we cite to those cases. But it's not exclusive expertise. I mean, it doesn't mean that only one entity can have expertise in a model. Certainly there are gradations. But I think it is important to note that even in the declaration submitted by the United States by Derek Hilt, he points out to the fact that a key component of the CALSIM model, which is an equation called the artificial neural network, which sets the delta conditions, is, in fact, developed by the Department of Water Resources. And Mr. Hilt, the United States expert, says working with the ANN is very complex. Few outside of DWR know how to work with it. But he could have been one of the few. I'm sorry? He could have been one of the few. That would be interesting if you read the remainder of his declaration. He expressly declines to use the ANN equation and uses a much more simpler Kimmerer and Monistat equation. So Mr. Hilt was given an opportunity to use the artificial neural network equation and he declined to do it because working with ANN is very complex and few outside the Department of Water Resources know how to work with it. So we submit that a lesser level of deference should be given to the U.S. Fish and Wildlife Service of the use of the day fluid CALSIM. Our second point, and I know I'm out of time, Your Honor. Over time, so could you wrap that? Certainly. We submit that the 7481 kilometer RPA is not supported by any evidence in the record. Did the Department of Water Resources propose a different measure? Did you propose a different kilometer? Marker. Yeah. What else was Fish and Wildlife Service supposed to do? Did you have an alternative? At the proceedings before the biological opinion, we submitted that X2 was not an appropriate surrogate for a habitat. So we did not propose a marker. So you think that X2 is just wrong as a measure? There can be shown no relationship between X2 and smelt abundance. That said, the Court, if there was a determination that X2 was valuable, certainly they could have put a range in rather than hit a target, which there is no statistical evidence. But that doesn't mean that the science is not good science. Well, there is no science showing that a X2 marker at 74 KM affects smelt abundance. Okay. Are you denying the science that shows that X2 bears some relationship to the well-being of the smelt? There certainly is clear conflict from the U.S. Fish and Wildlife Service's own analysis. The only study which they point to shows that salinity is related to abundance, chops the data set in half, that is the FAIR 2007 study found in ER 1479, and finds a relationship only as to what is called the post-pod or pelagic organism decline period between 1968 and 1986. Could any of the scientists dispute the X2 theory? Well, I should say the biop itself disputed the application of the salinity as a constraining factor on the smelt. Is the DWR's position that salinity is not related to the health of the smelt? DWR's position is that there is no clear evidence that salinity is in fact related, and in fact the U.S. Fish and Wildlife Service says that the smelt habitat definition that they use by Fred Fire is not the primary limiting factor constraining smelt population. Primary is a very, very loaded word, because as I read the biop, Fish and Wildlife Service was really quite careful to say, look, there's a lot of complex things going on, there's a lot of moving parts here, and no single thing is going to determine the health of the smelt. So to tell me that it's not the primary thing is actually of no use. I think the question was, is the DWR's position that salinity is not related to the health? DWR's position is salinity is not related, but specifically the 74 and 81 kilometer requirement, which is a quantitative number developed by the U.S. Fish and Wildlife Service, cannot be justified based on any science in the record. In the opening brief, the United States contended that there was a statistical correlation between 74 kilometers of smelt abundance. They abandoned that position in the reply brief, and they no longer stand by it. Is the DWR's position that salinity is irrelevant and that the salinity level, that X2 can move as far eastward as it wishes without affecting the smelt? If it is, I'm really confused, counsel. It is the position that fall X2, which is for those months September, October, and November, are not related to smelt abundance. There's a separate issue with regard to spring X2, which is not at issue in this biological opinion. So it is not the position of the State Department of Water Resources that salinity is not related to smelt. Counsel, did you have experts that opined that salinity does not correlate with the health of the smelt? We, before the biological opinion was produced, we provided comments objecting to X2. In the record, are there any experts from DWR that support your argument here that salinity is unrelated to the health of the smelt? No, Your Honor. In terms of providing the expertise, we related our expertise and declarations to the calcium day flow issue, because that was our issue, and we left the biological testimony to other parties to the extent there was any extra record evidence. But at the pre-BIOP proceedings, we did object to the X2 on scientific grounds. Understood. Thank you, counsel. Thank you. Rebuttal. Two minutes. May it please the Court, Robert, I'm just going to try to be very quick on fall X2. There certainly is evidence in the record that supports it. Number one, I would refer the Court to the Statistical Association. It's found at 4ER383. Also, the relationship between X2 and habitat is shown in Figure V17, 4ER840. In terms of the location of X2, it's really geography, and that's also in the BIOP. At 74 kilometers, they have access to Susan Bay. Move it to 73, you increase the water cost with very little increase in habitat. Isn't the reason you chose 74 and 81 that there are measuring stations there? As to one of them, I know DWR requested that a move be made from 85 kilometers to 81, because there was a monitoring station at 81 and there wasn't one at 85. But that's true. I don't recall any such thing about any point being made by DWR with respect to 74. Counsel, could you address the well salvaged data issued? Why was it normalized in some parts, 15, and was normalized in others? It was normalized in the incidental take state, because it's very important, because we recognize that the amount of smelt taken could be a function of a bigger population. It could also be a function of many other factors, such as location of the smelt vis-a-vis the pumps. As to the minus 5,000, it was just one piece of evidence. It had been imposed by the district court as part of his interim remedies after he found the last BIOP arbitrary and capricious. There was evidence supporting it. There's other evidence relating to particle tracking modeling that supports it. But we recognize that with all of this, there's a great deal of uncertainty and a great deal of work to be done if we were to come to an absolute answer here on the minus 5,000. Thank you. All right.  30 seconds. Thank you, Your Honor. I'd just like to briefly address your last question on the raw salvage issue, because it perfectly exemplifies why the district court ran into danger here by admitting all this extra record evidence. It allowed itself to be talked into flaws in the services analysis that weren't there. The service sets Old and Middle River flow limits in real time based on a number of considerations. One of those considerations is how many smelts have been taken at the pumps in relation to the take limit for that year. The take limit for that year is set based upon a normalized salvage analysis precisely done in the way that plaintiff's expert, Dr. Drieso, recommended. It's part of the setting of the OMR flow requirements. It's just not in the narrow portion of the buyout that their expert looked at and the court neglected to recognize that. Thank you, counsel. Thank you to all counsel for your helpful arguments in this very complex case. The case is argued and submitted for decision by the court, and we are in recess until 9 a.m. tomorrow morning. All rise.
judges: Arnold, Rawlinson, Bybee